## MILLION AND WIFE V. TAYLOR.

1. FRAUD: *Confidential relations: Dealings between brother and sister.*
   Ordinaril , about ordinary matters, if there be nothing in the circum-
   stances showing dependence and trust on the one hand, and the
   assumed duty of protection and counsel on the other, equity will not
   compel a brother to treat a sister with more tenderness in their deal-
   ings than other women; yet, though this relation differs generally in
   its confidential nature from that between parent and child, guardian
   and ward, etc., it has been held to assume a confidential character,
   not only a  to brother and sister, but between any near relatives deal-
   ing with regard to inheritances or distributive shares of estates com-
   ing to them jointly; many authorities exacting under such circum-
   stances *uberrima fides*, with the duty of full disclosure of everything
   affecting value and each others interest in the subject matter. Blood
   relations so dealing are under a mutual obligation, not merely to say
   ·or do nothing to mislead, but to give such counsel as would presum-
   ably proceed from a third person who was equally concerned for all.
   Such contracts are wholly different from family compromises for
   peace and harmony.  Courts of equity are as earnest to support the
   latter as to look upon the former with distrust and suspicion.

.APPEAL from *Hempstead* Circuit Court in Chancery.
Hon. J. K. YOUNG, Circuit Judge.

*Dan. W. Jones*, for appellant:

The relation of brother and sister, the confidence reposed,
her ignorance of the value, etc., appellee's knowledge of
the value, quality, etc., and the false representations ·
thereof, etc., furnish the strongest grounds for equity inter-
ference. *Story's Eq. Juris.*, *vol.* 1, *sec.* 190 *et seq.*, 193
·*et seq.*; 30 *Ark.*, 535.

*Williams & Battle*, for appellee:

As to misrepresentations, etc., see 11 *Ark.*, 58; 19 *Id.*,

522 ; 26 *Id.*, 30 ; 31 *Id.*, 170. No fraud is shown or proven.

EAKIN, J. This is a bill by an heir to recover of another heir, who is her brother, an interest in the lands of their deceased grandfather, and to cancel a deed for her interest which she had executed to the defendant, alleging that it had been obtained by fraud and misrepresentation. This is denied, and is the only issue. The court below refused the relief.

The parties lived in Bradley county, Tennessee, and the lands are in Hempstead county, Arkansas. It is shown by the pleadings, together with the preponderance of evidence, notwithstanding some conflict, that the complainant, being yet a girl under age, agreed, verbally, for ten dollars, to sell her interest, being one eighteenth, in these lands, to a cousin, Alfred Taylor, who, as well as the defendant, was engaged in the speculation of buying up the interest of the other heirs. This to begin with, was dealing with a child in a very reprehensible manner. The defendant says as he is informed, that this payment was not made to her as a *purchase* of her interest by Alfred, but as "hush money," to induce her to conceal her interest in the lands until he could effect a sale of them. This is worse, as it would be an effort to make her a party in craft and duplicity. The defendant disclaims, also, any interest in the purchase so made, if it were a purchase, but we find that, after his sister, the complainant, became of age, he approached her on the subject, and without any additional consideration paid at the time, obtained from her a deed of conveyance, in which her husband joined. This was in 1876.

The account given by herself and her husband of this transaction, which is in many points strongly corroborated by other witnesses, is, that her brother claimed the deed on

account of the ten dollars paid by Alfred, representing that he was entitled to it, because he had furnished Alfred the money, and the purchase had been made by Alfred for him. He says there was an additional payment also, to-wit, a saddle 'worth twelve dollars, and her part of the cost for making a certain grave yard fence, worth thirteen dollars, and that he was to pay her the balance of the consideration expressed in the deed, which was in all forty dollars, when he got possession of her interest in Arkansas. She says, on the other hand, that the saddle and cost of the fence were otherwise paid for out of monies of her own in her brother's hands. The proof tends to show that at the time the conveyance was made, she believed the lands to be worthless and of no value. The defendant seems to have been an older brother, and from indications in the transcript was an intelligent man of business. He knew at the time that the St. Louis, Iron Mountain and Southern Railroad had run through or near the lands, and although he denies that he represented them as worthless, he does not show that he took any care to advise his sister as to their real value, or as to her best interests in any manner. She seems to be a woman of no knowledge of business affairs beyond that of other women in the common walks of life.

He came to Arkansas with this deed to obtain possession, and afterwards the complainants heard, first through others, and then from himself, that the interests they had conveyed were worth thousands of dollars. His own lowest estimate of the value is $1200. They demanded a reconveyance, which he refused. Finally, as they testify, he agreed to give it up if they would give him a power of attorney to act for them with regard to the lands. They consented and executed the power in 1878. He, then armed with both papers, refused to reconvey the lands, but recorded the power. They afterwards revoked the power in 1879, mak-

ing the revocation matter of record. He then caused the original conveyance to be recorded, and claims under that. The object of the bill is to cancel it.

The defendant, in his deposition, as well as his answer, denies that he agreed to reconvey when he obtained the power of attorney, but says he gave complainant, his sister, an additional compensation for the power of attorney, which he wished to have to avoid the champerty laws, as he had been advised they were here in force. He says he gave her some old pieces of furniture, which cost over a hundred dollars, at first, but had been worn. If this testimony could avail the defendant, at best, we incline to think the preponderance of testimony, and reason itself is against it. The sister had then learned the value of her interest, and had perhaps an exaggerated estimate of it. If she were willing to renounce it for the *douceur* of the present enjoyment of a few pieces of second-hand furniture, she was not competent to contract, at least with her brother, concerning parts of a common inheritance. What should we think of a brother who would advise a sister to make such a contract with third parties? There is no definite showing that the lands were in litigation, or that the title was in danger. The whole of the lands had been once sold by order of court for partition, but they had been bought in by the agent and guardian of all the parties, who is not shown to have set up any adverse title. The defendant does not show how much he expended to clear the title, or whether anything, or what he did besides coming to Arkansas and "working at it" about a year. The sort of work is left wholly to conjecture. There is some vague showing of a compromise with parties claiming, but it is not definite. The values of the interests are fixed upon the net outcome.

It is true that all persons are bound by their contracts, intelligently made, however improvident they may be, if

they deal at arms length as strangers, under no obligations of protection or confidence. And it is *generally* true that the mere relation of brother and sister does not impose that confidence of itself. Ordinarily, about ordinary matters, if there be nothing in the circumstances showing dependence and trust on one hand, and the assumed duty of protection and counsel on the other, equity will not compel a brother to treat a sister with more tenderness than other women. These things belong to the imperfect duties, which even equity cannot undertake to enforce. Yet, conceding that this relation differs, generally, in its confidential nature from that between parent and child, guardian and ward, attorney and client, principal and agent : it has been held to assume a confidential character, not only as to brother and sister, but between any near relatives, dealing with regard to inheritances, or distributive shares of estates, coming to them jointly. There are many authorities exacting under such circumstances *uberrima fides;* with the duty of full disclosure of everything affecting value, and each other's interest in the subject matter.

In Mr. Hare's notes to the case of *Hugnemire* v. *Boseley*, in the second part of *vol. II*, of the *4th Edition of Leading Cases in Equity*, *p.* 1213, he lays down this principle as the result of the authorities, and speaking of blood relations so dealing, he says, "They are consequently under a mutual obligation, not merely to say or do nothing that is calculated to mislead, but to give such counsel as would presumably proceed from a third person, who was equally concerned for all."

The numerous cases to which he refers, although, many of them resting upon the peculiar circumstances, involving imbecility, or weakness of intellect, or special confidence, which would equally apply to strangers in blood, nevertheless support the declaration in its full extent. It will be

noted, however, that contracts with regard to the purchase of interests stand, wholly, upon different grounds from family compromises for peace and harmony. Courts of equity are as earnest to support the latter as to look upon the former with distrust and suspicion.

In the case of *Dunn* v. *Chambers*, 4th *Barb.*, 376, 381, HARRIS, J, said: "The double relationship which the parties bore to each other as kinsmen, and joint recipients of their grandfather's bounty, should have prompted the defendant, instead of profiting by the recklessness and improvidence of his cousin, to take measures more effectually to secure the property for his benefit." The sentiment finds a ready echo in every breast, and when it comes to be applied to dealings concerning common inheritances, it becomes a moral duty, which courts of equity *can* enforce, as effectually as in cases of mutual confidence.

A leading English case, tending in this direction, is that of *Dunnage* v. *White*, 1 *Swanston*, 138. There was no proof of fraud or undue influence. Yet the court set aside the conveyance by an heir to distributees and devisees of the same estate because of its improvidence, and general unfairness. The heir had not retained for himself more than, under any circumstances, he could have claimed, and had abandoned important interests he might have claimed. He was addicted to drink, and had low tastes, but was not mentally imbecile. The decision rests simply on the grounds of an unfair advantage taken of ignorance, and improvidence, by relations claiming benefits in the estate.

In the case of *Stuart* v. *Stuart*, 7 *J. J. Marshall*, 183, the court cancelled an instrument executed by a widow to an illegitimate son of deceased, by which for a small consideration, she abandoned important interests in the estate. There was evidence of very indelicate conduct in asserting claims during the freshness of her grief, in a violent and

54—38

offensive manner, and some evidence of fraudulent conceal-
ment, but the court placed its opinion upon broader grounds,
to-wit : that the consideration of the contract was trifling ;
that for a very inconsiderable portion of the property
devised to her, she had given up the balance worth twenty
times as much. *Upon the whole case* the contract was
held to come within the class which are so *unreasonable* as
to require the interposition of the Chancellor.

The expressions of the Supreme Court of Alabama in the
case of *Boney et al* v. *Hollingsworth et al,* 23 *Ala.,* 690, are
very pertinent to this. That, too, was a case where a con-
veyance had been by a sister to her two brothers of an inter-
est in the estate of the father, and which her heirs, after
her death, sought to cancel. The circumstances of the case
in several respects resemble this, and the indications of
actual fraud were no greater. The deed was cancelled.
Some idea of the grounds assumed by the court may be
derived from the following extract from the opinion :
"Until some inducement is shown, the law must always
regard with suspicion an act by which a sister divests her-
self of a valuable interest in favor of a brother. There
may be no fraud, everything may be honest and fair. But
until the act is satisfactorily accounted for, the inference
of fraud, artifice, or abuse of confidence is so strong, that
we think equity should always relieve against it."

Why multiply citations of precedents? This contract
now under consideration is shocking to our sense of fair
dealing. It is attended with numerours marks and indica-
tions of craft and over-reaching. The gross inadequacy of
price ; the advantage taken of the old promise during
minority, the attempt to conciliate with old furniture ; the
defiant attitude taken when the papers were at last obtain-
ed, all indicate the shrewd trader seeking his own advantage
at the expense of a sister's interests.

The court erred in dismissing the bill. It should have taken an account of what he had actually paid in value, and her proportionate part of the *necessary* expenses in getting her title defined and established, and allowed him that, making it a lien on the land, and should have cancelled her conveyance.

Reverse the decree and remand with usual directions.