## GIERS *v.* HUDSON.

### Opinion delivered December 18, 1911.

1. PARENT AND CHILD—TRANSACTIONS BETWEEN.—Where a daughter, though of age, remains under her father's roof, any contract, conveyance or business transaction between them will be closely scrutinized by the courts. (Page 239.)

2. SAME—WHEN CONVEYANCE FROM DAUGHTER UPHELD.—A conveyance from a daughter to her father, made while she lived with him, will not be permitted to stand unless the transaction is characterized by the utmost fairness and good faith on the father's part. (Page 240.)

3. FAMILY SETTLEMENTS—WHEN UPHELD.—Family settlements are to be encouraged, and, when fairly made, strong reasons must exist calling for interference on the part of a court of equity. (Page 243.)

Appeal from Ouachita Chancery Court; *Zachariah T. Wood,* Chancellor; affirmed.

*Thornton & Thornton* and *Powell & Taylor,* for appellant.

1. The demurrer to the answer was properly sustained, as the claims of appellee Hudson against his deceased wife's estate were not legal, valid claims; and if they were, equity had no jurisdiction to allow judgments for them. 33 Ark. 727; 48 Ark. 544; 90 *Id.* 444.

2. If there was *any* consideration, it was grossly inadequate. If Hudson advanced or expended money, it was an advancement which the law presumes to be a gift. 36 Ark. 566, 586; 40 Ark. 67; 45 *Id.* 484; 48 *Id.* 17; 52 *Id.* 188; 63 *Id.* 374; 68 *Id.* 405; 70 *Id.* 145; 76 *Id.* 389; 86 *Id.* 448; 71 *Id.* 373.

3. Hudson's claims were barred by laches. 37 Ark. 155; 47 *Id.* 475; 56 *Id.* 663; 73 *Id.* 440.

4. A life tenant should not be allowed for permanent improvements except out of the rents and profits. 23 Pa. St. 305; 2 Swan. (Tenn.) 362; 50 S. W. 33; 98 S. W. 1031; Tiedeman on Real Prop., 68.

5. Deeds should be cancelled for fraud, imposition, deceit, concealment, inadequacy of consideration and mistake of their purport and effect. Appellant was overreached, at least, by one who stood in a confidential relation. 74 Ark. 68 and 71 Ark. 185 are not applicable to this case. 32 N. J. Eq. 594; 13 Pac. 434; 31 Ban. (N. Y.) 9; 6 N. Y. 268; 62 Pac. 714; 27 *Id.* 940; Story, Eq. Jur., 309-317; Kerr, Fraud & Mistake,

150-3, 177-9; Bigelow, Fraud, 250-264; 43 N. E. 336; 18 N. W. 918; 4 Mylne & C. 277; 57 Ill. 186; 8 DeG., M. & G. 133; 7 *Id.* 597; 31 Barb. 9; 8 How. 183; Pom. Eq. Jur., par. 961; 2 Ves. 547; 9 *Id.* 292, note; Hoff. Ch. 267; 15 Beav. 299; 7 *Id.* 551; 1 Ired. Eq. 460; 34 Beav. 457; 44 Mo. 465; 2 Lead. Cases Eq. 556 and notes; 46 Iowa, 684; 122 N. W. 444; 90 *Id.* 583; 88 *Id.* 452; 81 Ala. 530; 9 *Id.* 662; 23 *Id.* 690; 69 Ala. 555; 75 *Id.* 555; 63 Md. 371; S. R. 10 Eq. 10; Adams, Eq. 184; 74 Ark. 231; 58 N. E. 480; 142 Ill. 160; 2 Pom. Eq. Jur., par. 953, (3 ed.) 951, 961, 927, 928; *Id.* par. 948-955-6, 962; 38 Ark. 428; 40 *Id.* 28.

6. Because of the fiduciary relations existing, the deeds are voidable at her option. 23 Ark. 622; 26 Ark. 446; 54 Ark. 632; 55 *Id.* 85; 78 Ark. 111; 89 *Id.* 169 *Id.* 169; k. S. R. 142.

*Warren & Smith* and *Gaughan & Sifford,* for appellee.

1. No fraud was practiced; nor was there any concealment, nor deceit. The consideration was adequate. There was no undue influence; the act was voluntary and free after a clear explanation. The presumption is that a benefit was intended the child in discharge of a moral and parental duty. 173 U. S. 20; 31 Fed. Cases, 598; 74 Ala. 619; 81 *Id.* 541; 60 Am. Rep. 175; 1 So. 217; 8 App. D. C. 284; 109 Ill. 73; 211 *Id.* 607; 98 Ky. 114; 50 N. H. 498; 9 W. N. C. 259; 1 Chester Co. Rep. 425; 54 Pa. 484; 16 Tex. 583; 19 Tex. Civ. App. 335; 47 S. W. 61; 2 Wash. 632; 27 Pac. 456; 21 W. Va. 479; 8 How. 201; 9 Otto 210; 2 Cliff. 154-5.

2. A conveyance to a parent by a child is *prima facie* valid, and the proof of undue influence is on the party attacking. 173 U. S. 17; 13 Fed. Cases, 598; 160 Ill. 73-4; 12 Pet. 24; 109 Ill. Sup. Ct. Rep. 198; 74 Ala. 619; 1 Perry on Trusts, § 201; 12 Pet. 253; 98 Ky. 115; 8 How. 183; 24 Tex. Rep. 427; 21 W. Va. 469; 32 N. J. Eq. 594; 120 Mo. 253; Eaton Eq. 328; Bisp. Eq. (7 ed.) § 235; 173 U. S. 21; 118 *Id.* 127, 134; 135 *Id.* 167, 172-3.

3. A careful review of the following cases show they all stand upon incontestable proof of fraud, misrepresentation and overreaching on part of defendant. 32 N. J. E. 723; 72 Mo. 669; 65 Mo. 378; 70 *Id.* 580; 62 *Id.* 226; 46 How. Pr. 389; 26 Beav. 594; 2 Wash. C. C. 397; 1 Edw. 338; 7 DeG., McN.

& G. 597; 1 Jurist (N S.) 932; 2 Dr. & W. 470; 7 Beavan, 557; 15 *Id.* 278; 31 Barb. (N. Y.) 268; 13 Pac. 434; 5 Mo. App. 33; 7 Beav. 557; 31 Barb. 9; 6 Hun 80; 62 Pac. 714.

4. Compromises and family arrangements or settlements are always favored. 2 Pom. Eq. Jur. (3 ed.), § 962, note 3, 928; 1 Perry, Trusts (6 ed.) § 201, 189, note (a).

5. The influence which invalidates such deeds must be of such nature as to deprive the grantor of his free agency. 173 Ill. 539; 147 *Id.* 370; 168 Mass. 107; 118 Pa. St. 359; 120 Mo. 252; 11 Wash. 79; 33 Ore. 486; 81 Ky. 10. Some good substantial reason must be shown where a person of full age and sound mind executes even a voluntary deed, and then seeks to set it aside. Godefroi, Law of Trusts, (2 ed.) 109; 31 Beav. 629, 244; 3 D. J. & S. 487; 19 C. D. 403; 173 Ill. 550; 147 Ill. 370. Especially is his true of family settlements. 98 Ark. 93; 84 Ark. 610.

McCULLOCH, C. J. On August 31, 1909, the plaintiff, Miss Berenice Hudson Giers, instituted this action in the chancery court of Ouachita County against her father, Dr. G. W. Hudson, of Camden, Arkansas, to cancel two deeds which she and her brother, Woodland Hudson, had, on September 24, 1907, executed to her father, conveying to him their several interests in certain real estate formerly owned by their mother, Doctor Hudson's deceased wife, and in which Doctor Hudson had an interest as tenant by the curtesy. In his answer Doctor Hudson stated that one of the deeds was intended as a conveyance to him in trust for his said children for certain purposes and upon the prayer of plaintiff's complaint, without objection on the part of the defendant, the court canceled that deed So that feature of the case has passed out, leaving only the issue as to the deed conveying the lot which is known as the "home" place. At the time of her death in the year 1900, Mrs. Hudson owned the "home" place, which had been conveyed to her some years before that time by her mother, Mrs. Woodland. She also owned another improved lot, known as the "Thal" place, which Doctor Hudson had purchased and paid for and caused to be conveyed to her. Both of these places are situated in the city of Camden. She also owned an undivided third of certain other property embraced in the other deed which the court canceled. Doctor Hudson had, of course, a curtesy estate in the

"Thal" place, and also in the "home" place, subject to the homestead right of his children during minority.  He married again in 1902, and had another child, the issue of the last marriage.  Mrs. Hudson left surviving two other daughters, who subsequently married and died childless, leaving plaintiff and her brother Woodland as their heirs at law.  So, at the time of the execution of the deed in controversy, plaintiff and her brother owned the "home" place and the "Thal' place, subject to the father's estate as tenant by the curtesy.  The plaintiff was at that time twenty-two years of age and unmarried.  She married shortly afterwards, and up to that time lived with her father.  Her brother was about nineteen years of age, but his disabilities had been removed.  He refused to join his sister in this action to cancel the deed to his father.  The plaintiff bases her prayer for relief on two grounds: first, that the execution of said deed was procured by fraud and deception on the part of the defendant in falsely representing to her that the effect of the deed was to convey only a life estate in the property, and in asserting false claims against the property, and, second, that the consideration therefor was inadequate, which on account of the confidential relation she asserts is sufficient to call for rescission.  The defendant denied the allegations of fraud, and pleaded the adequacy of the consideration for the execution of the deed.  The chancellor found in favor of the defendant on both issues, and rendered a decree dismissing the complaint for want of equity as to that transaction.

The witnesses to the transaction which constitutes the subject-matter of this controversy were the plaintiff herself and the defendant and Woodland Hudson, the brother who joined in the conveyance, and E. B. McCall, an attorney-at-law, who, as notary, took the acknowledgments to the execution of the deed.  The plaintiff and defendant were equally interested in the result of the controversy.  Woodland Hudson was entirely disinterested pecuniarily, though he could not have been indifferent to such a controversy between his father and sister, and his sympathy would naturally be with one or the other.  Mr. McCall had no interest whatever in the result of the suit, and he appears to be unbiased, either by sympathy or prejudice.  The plaintiff was, as before stated, living with her father at the time the deed was executed, and they were living

in the house on the lot in controversy which had constituted
the family residence for many years.   She was a highly intel-
ligent young woman, her father having given her the best of
educational advantages, but she had had no business experience.
She was absent from home for two years while attending school
at Holly Springs, Mississippi; and at St. Louis, and returned
home a few months before the execution of this deed.

She testified that the first that was ever said to her about
signing any paper was on September 23, 1907, the evening
before the deed was executed, when her father said, "Now,
you are going to get married, and your brother is going away,
and I want you to sign a paper giving me the use of the 'home'
place for my lifetime, but at my death to come back to you and
your brother."   She testified that very little was said by her
father at that time, and no explanation was given, but that he
renewed the request the next morning, and said that he would
bring Mr. McCall to the house in a short time for the purpose
of having the paper signed, and that she replied, "I don't want
to sign it," and he said, "If you don't, I will disinherit you."
She states that soon afterwards her father returned with Mr.
McCall, and while they were all in the library or office together,
her brother Woodland being also present, the request was
renewed for her signature to the paper, which she says was
never called a deed in her presence.   She narrates as follows
what then occurred:   "Mr. McCall came and said, 'I come to
you to sign this paper,' and I said, 'I don't understand it.'
My father said, 'She does understand, but don't want to sign
them.'   Mr. McCall said: 'Well, Miss Berenice, you are giving
your father the use of the "home" place for his lifetime, and
at his death it is to come back to you and your brother.'   I
had agreed to do that for my father, and that was my understand-
ing of these instruments.   *   *   *   As soon as I signed it,
my father grabbed the paper, and I asked, 'Is that all right?'
and he replied, 'Everything is all right; you have nothing to
fear.' "

She recites in another part of her testimony that she made
a remark to McCall: "I don't see why I must sign this paper
for my father, because he will be perfectly welcome to live
here all his life."   She also states that she did not read the
instrument, and did not know it was a deed.   She testified that

afterwards, either during the afternoon of the same day or the next morning, her father told her that he would give the "Thal" place to her and her brother, saying, "I will give you the 'Thal' place as a gift, so you can realize something for your own use, as you are going to be married, and will need some money, and you will not have to come back to me all the time." The above is a fair epitome of her testimony covering the execution of the deed. She further testified that she never made the discovery that she had conveyed the property to her father until she and her brother sold a part of the ' Thal" place in the fall of 1909, when, in looking over the records with her husband, her attention was called to the record of this deed.

Doctor Hudson, the defendant, testified that, prior to the execution of the deed, he had several conversations with his son and daughter concerning the settlement or adjustment of matters with reference to the property left by their mother, his first wife. He says that in those conversations he spoke of the unsatisfactory condition in which the property stood with reference to his life estate and his claims against the property, and that he finally proposed to them that, if they would convey the "home" place to him absolutely by warranty deed, he would, in consideration thereof, relinquish to them his life estate in the "Thal" place, and also relinquish certain other claims, the nature of which will be explained later in this opinion. He says that the various conversations between him and them covered a period of a month or more, and that they assented to his proposal and seemed satisfied, or at least that they did not reject it; that he had the deed prepared and gave it to Mr. McCall to take the acknowledgments, and requested the latter to explain the matter fully to his daughter; that he was not present when the deed was executed, and did not make any of the statements attributed to him by his daughter in her testimony. He denied that he ever coerced his daughter into signing the deed, or threatened her in any way, or that he misrepresented any fact to her, or concealed anything.

Woodland Hudson testified that during the summer of 1907 he was away from home, and returned on September 15, 1907, in response to a letter from his father requesting him to come for the purpose of adjusting matters concerning the

property left by his mother; that on his return, and from then up to the time of executing the deed, his father had a number of conversations with him and his sister, in which he explained to them the condition of the property and his claims against the same, and proposed to relinquish his claims, including his life estate in the "Thal" place, in consideration of their conveying to him their interest in the "home" place; that he further explained to them that the "home" place would thereby become a part of his estate, in which they would share *pro rata* at his death, but that that would be a matter in his control, as the property would belong to him absolutely. He further testified that he and his sister had several conversations in the absence of their father concerning the matter, and that he fully comprehended his father's explanation of all the matters and assented to the proposal, but that his sister did not seem to understand it fully, and did not appear to ful y understand it until the final explanation was made by Mr. McCall when the deed was signed. He relates the occurrences at the signing of the deed; says his father was not present; that McCall explained everything fully to his sister; that the deed was explained and read over to her. He states that McCall's explanation concerning her sharing in her father's estate at his death was not different from the explanation of his father to her. His testimony is in direct conflict with plaintiff's testimony as to what occurred. He states, however, that in one of the conversations between his father and sister she expressed a willingness to sign a deed conveying a life estate, but that his father wanted an absolute deed and told her so.

Mr. McCall testified that he had no interest in the controversy, and had nothing to do with the transaction except, at the request of Doctor Hudson, to go out to the latter's residence ·and explain the matter fully to his daughter and take the acknowledgments; that he did this, making the explanation to her that Doctor Hudson made to him; that he told her that he· had come for her to sign the deed, and explained that her executing the deed would not bar her from sharing in her father's estate, but that she would share in it like the other heirs; he said that he spoke of the deed to her *not as papers* but as a deed, and that she had the deed in her hand, but he does not remember whether he read it over to her or not. He stated that Doctor Hudson

was not present at his interview with plaintiff when the deed was signed, and that the conversation testified to by plaintiff did not occur. He denied specifically that he said to to her, "You are just giving your father the use of the 'home' place for life." Mr. McCall's testimony, it will be seen, is flatly contradictory of that of plaintiff as to what occurred on that occasion.

The record in the case is very voluminous, but the above is thought to be a sufficient statement to give a correct idea of the state of the evidence upon which the chancellor based his findings in favor of the defendant upholding the deed.

The law is too well settled in this class of cases to leave any doubt as to what principles should be applied in determining the questions at issue. The industry of learned counsel on each side has brought to our attention in their briefs all of the authorities bearing on the subject, which will be set out in the abstract and need not be cited again here.

The plaintiff had attained the age of legal majority several years before the execution of the deed, but she still resided with her father, and is deemed to have remained, to some extent at least, under his parental control. Under those circumstances, any contract, conveyance, or business transaction between them must be scanned with the closest scrutiny. Yet the deed is not void merely because of the existence of the parental relation, but it should be declared void unless free from the objection of fraud, duress, undue influence, misrepresentation or concealment of facts, or inadequacy of price. It will not be permitted to stand unless the transaction is characterized by the utmost fairness and good faith on the part of the parent who accepted the conveyance from his child. The following language of Lord Chancellor Cranworth in the case of Savery v. King, 5 H. of L. Cases, 627, forms the basis of much of the learning on this subject and accurately states the controlling principle in this class of cases:

"The legal right of a person who has attained his age of twenty-one to execute deeds and deal with his property is indisputable. But where a son, recently after attaining his majority, makes over property to his father without consideration, or for an inadequate consideration, a court of equity expects that the father shall be able to justify what has been

done; to show, at all events, that the son was really a free agent, that he had adequate independent advice, that he was not taking an imprudent step under parental influence, and that he perfectly understood the nature and extent of the sacrifice he was making, and that he was desirous of making it."

This court in the case of *Million* v. *Taylor,* 38 Ark. 428, in speaking of a business transaction between brother and sister, where the proof showed that a state of great confidence existed, held that the transaction must have been characterized with the utmost good faith before it could be upheld.

In *Reeder* v. *Meredith,* 78 Ark. 111, this court quoted with approval the following statement of the law from Perry on Trusts:

"Section 195. A trustee may buy from the *cestui que trust,* provided there is a distinct and clear contract, ascertained after a jealous and scrupulous examination of all the circumstances; that the *cestui que trust* intended the trustee to buy, and there is fair consideration and no fraud, no concealment, no advantage taken by the trustee of information acquired by him in the character of trustee; the trustee must clear the transaction of every shadow of suspicion. * * * Any withholding of information, or ignorance of the facts or of his rights on the part of the *cestui que trust,* or any inadequacy of price, will make such purchaser a constructive trustee."

Now, it is equally well settled that this rule which requires a close scrutiny of such transactions is not enforced for the purpose of defeating the contract between parties merely because confidential relationship exists, but it is enforced solely for the purpose of discovering what the real intention of the parties was and to prevent one occupying such a relation of trust from securing an unfair advantage by reason thereof. In the case of *Hannaford* v. *Dowdle,* 75 Ark. 127, which involved an attack by the heirs of a deceased wife upon a conveyance made by her to her husband, we said:

"Appellees invoked the elementary rule of law that gifts from the wife to the husband are to be scrutinized with great jealousy. Citation of authority is unnecessary to sustain this salutary rule. But, after all, the demand for such scrutiny is to ascertain, and not to defeat when ascertained, the real intention of the parties, where the transaction is free from fraud.

Notwithstanding that relation, the court will, after having ascertained the intent of the parties to the transaction and found that there has been no fraud or imposition, uphold rather than frustrate their acts."

The Supreme Court of the United States, in *Jenkins* v. *Pye*, 12 Peters, 241, after laying down with utmost strictness the rule that a conveyance from a child to the parent should be scrutinized with care, said:

"But to consider a parent disqualified to take a voluntary deed from his child, without consideration, on account of their relationship, is assuming a principle at war with all filial as well as parental duty and affection, and acting on the presumption that a parent, instead of wishing to promote the interest and welfare, would be seeking to overreach and defraud his child."

Judge Story concurred in the judgment of the court in *Jenkins* v. *Pye*, and in the last edition of his Commentaries, which underwent his revision as has been stated upon good authority, he laid down the following doctrine on the subject:

"The natural and just influence which a parent has over a child renders it peculiarly important for courts of justice to watch over and protect the interests of the latter; and therefore all contracts and conveyances whereby benefits are secured by children to their parents are objects of jealousy; and if they are not entered into with scrupulous good faith, and are not reasonable under the circumstances, they will be set aside, unless third persons have acquired an interest under them, especially where the original purposes for which they have been obtained are perverted, or used as a mere cover. But we are not to indulge undue suspicion of jealousy, or to make unfavorable presumptions as a matter of course in cases of this sort." 1 Story, Eq. Jur. (4 ed.) § 309.

In *Towson* v. *Moore*, 173 U. S. 17, Mr. Justice Gray, after a very exhaustive review of the authorities, states the rule thus:

"The principles established by these authorities may be summed up as follows: In the case of a child's gift of its property to a parent, the circumstances attending the transaction should be vigilantly and carefully scrutinized by the court, in order to ascertain whether there has been undue influence

in procuring it; but it can not be deemed *prima facie* void; the presumption is in favor of its validity; and, in order to set it aside, the court must be satisfied that it was not the voluntary act of the donor.''

A careful consideration of the testimony in this case convinces us that the chancellor was not wrong in reaching the conclusion that this transaction between father and daughter was free from fraud or imposition. To reach any other conclusion we would be compelled to accept the unsupported statement of the plaintiff herself against that of her father, who is only interested to the same extent that she is in the result of the litigation, and also the testimony of two other witnesses, who are altogether disinterested. She is flatly contradicted upon nearly every important point by the testimony of each of these witnesses. She says that her father only asked her to convey the property to him for his lifetime, but in this she is contradicted by both her brother and her father. She says that Mr. McCall made the same statement to her when she executed the deed, but in this she is contradicted by McCall as well as by her brother, who was present. All of the other witnesses positively contradict her statement that her father was present when the deed was executed. Her contention throughout this litigation is that she did not know that she was signing a deed, but thought it was merely a contract or ''paper,'' as she described it, giving her father the right to use the place as long as he lived. After considering the testimony, we are forced to the conclusion that, though she was ignorant of business transactions and not advised as to the methods and forms of conveying property, yet it was clearly brought to her knowledge and understanding that she was making an absolute and irrevocable conveyance to her father of all her interest in this property. Her counsel insists that, as she did not, under the circumstances, know the full legal effect of a conveyance, she was misled by the statement of her father and of McCall to the effect that the execution of the deed did not bar her of her right to share in her father's estate at his death, into believing that after all the effect of the deed was only to convey a life estate, and that the property would at her father's death revert to her and her brother without her stepmother and half-brother having the right to participate therein. In the face, however

of the positive statements of these witnesses, it is not possible for us in reason to accord that much lack of understanding to the plaintiff, for the testimony is too plain to question that she fully understood that the conveyance was absolute. We can only repeat that to accept her version of this matter would be to take her unsupported word against that of three other witnesses. She shows that she was not versed in business matters and in forms of conveyances, but she was intelligent and well educated and evidently understood the meaning of language to the extent that she could comprehend, when explained, the effect of a transaction of that kind.

Attention is called to the fact that none of the witnesses say that it was fully explained to her that her father's second wife and the children of that marriage would share in this and any other property owned by her father at the time of his death. There was, however, no misrepresentation as to the effect of the conveyance in this respect, and she must have known, under the explanation given to her, that they would share in any property that the husband and father owned at the time of his death. In fact, Woodland Hudson testified that, though his father explained to the plaintiff that she would, as one of his heirs, share in his estate at his death, yet the disposal of his property was entirely with him, and that the conveyance which he sought would place the property absolutely at his disposal.

It should be borne in mind that this conveyance was not a donation to the father, nor was it, strictly speaking, a sale and purchase. It was more in the nature of a family settlement, which is always encouraged by the courts and upheld when fairly entered into. In the recent case of *Martin* v. *Martin*, 98 Ark. 93, it was said:

"Courts of equity have uniformly upheld and sustained family arrangements in reference to property where no fraud or imposition was practiced. The motive in such cases is to preserve the peace and harmony of families. The consideration of the transaction and the strict legal rights of the parties are not closely scrutinized in such settlements, but equity is anxious to encourage and enforce them. As is said in the case of *Pate* v. *Johnson*, 15 Ark. 275: 'Amicable and family settlements are to be encouraged, and when fairly made 　*　*　*　 strong reasons

must exist to warrant interference on the part of a court of equity.' "

In the case of *Baker* v. *Bradley,* 7 De Gex, M. & G. Rep. 597, which was decided only a few months prior to the decision in *Savery* v. *King, supra,* and while Lord Cranworth was Lord Chancellor, one of the justices, in delivering his opinion, said:

"Transactions between parent and child may proceed upon arrangements between them for the settlement of property, or of their rights in property in which they are interested. In such cases this court regards the transactions with favor. It does not minutely weigh the coniderations on one side or the other. Even ignorance of rights, if equal on both sides, may not avail to impeach the transaction. On the other hand, the transaction may be one of bounty from the child to the parent, soon after the child has attained twenty-one. In such cases thiy court views the transaction with jealousy, and anxiously inter poses its protection to guard the child from the exercise of parental influence."

Now, as to the alleged consideration to this conveyance: Doctor Hudson was at that time sixty-five years of age, and had a life expectancy of about twelve years    The market value of the "home" place at that time was $8,000 and that of the "Thal" place $5,300.    The "home" place was occupied by Doctor Hudson as a place of residence, and the "Thal" place was divided into two parts, each with a dwelling-house on it, and the two houses thereon rented for $33 per month.    He had a life interest as tenant by the curtesy in the Thal place, and also in the "home" place, subject to the homestead right of his son, Woodland, who was soon to become of age.    He had advanced to his two deceased daughters at the time of their respective marriages a sum of money which, with interest up to the time of this conveyance, amounted to $1,491.25.    He had exacted from them obligation in writing for repayment of those sums, which became a charge upon their estates inherited by the plaintiff and her brother.    This charge he proposed to assert and offered the relinquishment thereof as a part of the consideration of this conveyance.    He had, subsequent to the death of his wife, paid off a mortgage on the property amounting to $1,031.98, and he also claimed the right of reimbursement for this.    In addition to this, he asserted a claim for the sum of $1,900 paid in dis-

charge of another mortgage on the property in the year 1899, which was before the death of his wife. The effect of the settlement was that Doctor Hudson, in exchange for the reversionary interest of his children in the "home" place, gave up his life interest in the "Thal" place and also relinquished the other claims above enumerated. In addition to that, he urged the moral claim that the "Thal" place was purchased and improved with his own money and conveyed to their mother, and that the "home" place was in a dilapidated condition when conveyed to their mother, and that he had greatly improved the same and brought it up to its present value. We think that the consideration was not so inadequate as under the circumstances called for a cancellation of the conveyance, nor are we prepared to say from this testimony that it was not for the best interest of the plaintiff to make this settlement. She had no such interest in either the "home" place or the "Thal" place as would yield her any income until the death of her father. Her interest was of a speculative and uncertain value, and it is doubtful whether he could have realized any very substantial sum by a sale of her interest. A reversionary interest scarcely ever has any definite market value, but, on the contrary, the value is highly speculative. By this settlement plaintiff and her brother acquired a certain and definite marketable interest in the property, which not only yielded a present income from the rents but which could be realized upon by sale. In fact, they sold a portion of the "Thal" place for $2,300 in less than two years after this transaction occurred.

It is unnecessary for us to pass on the question whether or not all of the charges which Doctor Hudson asserted against the property were sustainable in law. Sufficient it is to say that the evidence convinces us that he asserted these claims in perfect good faith, that he informed his daughter of the existence and nature thereof, and that with a clear understanding of them she entered into a settlement with him and executed the conveyance pursuant to that settlement. If, with a clear knowledge of all the facts and without any fraud or undue influence on the part of her father, she freely and voluntarily executed the conveyance in settlement of their rights, then she ought to be and is bound by her act.

This is, of course, an unfortunate controversy, which is to be

deplored, but upon a careful consideration of all the evidence in the case we are of the opinion that the plaintiff has entirely failed to establish a state of facts which would justify a court of equity in setting aside the settlement made with her father and cancelling the conveyance which she made to him.

Decree affirmed.

HART and KIRBY, JJ., dissent.