FAULKNER, ADMINISTRATOR *v.* FAULKNER.

5-83                                                    257 S. W. 2d 570

Opinion delivered May 4, 1953.

Rehearing denied June 1, 1953.

Cecil Grooms, for appellant.

H. R. Partlow and Ward, Coleman & Mayes, for appellee.

WARD, Justice. James Thomas Faulkner, a citizen and resident of Greene County, died intestate December 16, 1951, at the age of 86, leaving as his survivors a widow, Nettie Faulkner, appellee herein, and four children by a former marriage. Three of said children were sons, named Golve [appellant], James David and Hall H., and one was a daughter named Gladys Faulkner Garner. His estate at death consisted of 140 acres of land [including the homestead] valued at approximately $9,000 and personal property valued at approximately $20,000. In 1924, after his children were grown and married, James Thomas Faulkner married appellee and lived with her until his death.

On October 22, 1943, the deceased signed a purported will in which he disposed of his property as follows: His widow to get $1,000 in money and, also, 60 acres of land [presumably the homestead] for life, with the remainder to the four children: James David to get 80 acres of land in fee; each of the remaining three children to get $2,000 in money; and the balance of his personal property was to be divided equally among his four children. The purported will was kept in a lockbox at Paragould until about three weeks before Mr. Faulkner died, when it was taken to his home and placed with his personal papers. Before Mr. Faulkner's death his

wife and his son, Hall H., had read the purported will and were fully aware of its provisions.

Mr. Faulkner was buried the day following his death, and a few hours after the funeral the widow and four children met in the kitchen of the family home and read the will. At this time everyone thought the will was valid, and it was agreed that Hall H. Faulkner, the named executor, should probate the will as soon as he could conveniently do so. Four days later, on December 21, when Hall H. presented the will for probate he was informed by an attorney that it was not valid and could not be probated because there was only one witness to the testator's signature. At the same time the attorney informed Hall H. and his brother, Golve, that if the members of the family wanted to abide by the wishes of the deceased as expressed in the purported will, they could enter into a family agreement to that effect and ask the Probate Court to appoint an administrator and have the estate distributed according to the expressed wishes of the deceased. Also, on the same occasion, the attorney prepared and delivered to Hall H. a ''Family Agreement'' for the widow and four children to sign. The said writing, minus the signatures, is as follows:

### ''FAMILY AGREEMENT

## ''KNOW ALL MEN BY THESE PRESENTS:

''That we, Golve J. Faulkner, Hall H. Faulkner, James David Faulkner, Gladys Faulkner Garner and Nettie Faulkner, being the widow and children and the sole and only heirs at law of James Thomas Faulkner, do hereby state that we have read the attached paper, the purported last will and testament of James Thomas Faulkner, and hereby agree, each with the other, to abide by the terms of the said purported last will and testament and consent that after the administration of the estate of James Thomas Faulkner is completed that the Probate Court of Greene County, Arkansas, may make an order of distribution distributing the said estate in the manner as set out in the purported last will and testament.

"We further agree that James Thomas Faulkner wanted his property and estate divided as set out in the attached purported will and state that it is our desire that his property and estate be divided just as he wished.

"Witness our hands on this the 21st day of December, 1951."

Following the above transactions Hall H. and Golve signed the agreement and on the same day Hall H. went to the home of the widow and took her in his car to the store operated by Golve where, according to appellant, the paper was read and signed by appellee. Later the agreement was signed by James David and his sister, Gladys. Pursuant to the above and to a waiver of notice signed by all parties, Golve was appointed administrator about a week later and proceeded to administer the estate in accordance with the provisions of the signed agreement. Later the widow and three children signed a deed conveying to James David the 80 acres of land mentioned in the deceased's purported will.

Before the administration thus begun was completed, appellee filed her petition in Probate Court for homestead, dower and statutory allowances. To this appellant pleaded the family agreement, and appellee replied that if she signed the agreement [which she denied] her signature was "procured through pressing, over-reaching, and misrepresentation amounting to fraud at a time when [she] was overcome with grief" and when she was "physically and mentally exhausted to the point of being incapable of realizing or understanding the nature and effect of the agreement." The Chancellor found in favor of appellee and we are asked to reverse that decision.

We are persuaded that the ruling of the Chancellor should be sustained and for the basic reason [assigned by him] that, without finding there was any active, conscious intent to deceive, the brothers and sister failed to reveal all information within their knowledge when, under the circumstances, they were bound to do so.

This was the situation: By the terms of the agreement the widow was to receive the homestead for life and $1,000, when under the law she was entitled to receive (a) the homestead for life, (b) her dower interest in all real estate, (c) one-third in fee of all personal property [amounting to approximately $6,000], (d) $1,000 under Ark. Stats. § 62-2501, and (e) certain other allowances under subsections b. and c. of the above-cited section. It is not contended by appellant that the above information was disclosed to the widow and her rights explained, nor was it explained to her how or why the "Family Agreement" came into existence. It is probably true, as stated by appellant, that appellee is an intelligent woman and read the agreement, but the agreement itself reveals none of the information mentioned above and might even have misled her into thinking the will was a valid instrument.

There are other circumstances that must also be considered. The agreement was presented for appellee's signature only four days after the death of her husband and it is not denied that she was greatly grieved at the time, and the fact that she was expecting the will to be probated as such could easily have prevented her from understanding the full import of the agreement. The record shows that appellee had been in ill health and nervous for about six months as a result of her husband's last sickness and that she had been treated for nervousness by doctors before and after his death. The record also indicates that appellee and the four children had been on friendly relations and that she was looking to them for help in the probation of the purported will.

Under the above facts and circumstances a confidential relationship existed between the widow and the four stepchildren and particularly between her and Hall H. and Golve, which fact imposed on them the duty of acting in utmost good faith and of making full disclosure of all information within their knowledge. A failure so to act in good faith and make full disclosure amounts to the exercise of undue influence, even though no overt act of deception may be committed.

In cases of this nature not only the family relation-ships but all the surrounding facts and circumstances are to be considered. In the case of *Caldcleugh* v. *Caldcleugh*, 158 Ark. 224, 250 S. W. 324, the Court said:

"Undue influence has a broad field to work upon in the condition of the person influenced. All the surrounding circumstances which might make him susceptible and yielding are to be considered. The doctrine of equity concerning undue influence reaches every case 'where influence is acquired and abused or where confidence is reposed and betrayed.'"

In the cited case the Court approved the cancellation of a conveyance from the widow to the brothers and sisters of her deceased husband and assigned as one of the reasons that: "She was not informed that her husband's mother would inherit a life interest in his real estate. She was not informed what her dower rights were in the premises." The Court did say: "She was only told that she could secure a greater interest by having a lawsuit." In the case under consideration the widow was not told anything about her rights or what she was giving up by signing the agreement, nor could there have been any valid threat of a lawsuit to prevent her from securing those rights.

In dealing with a similar question involving a confidential relationship in the case of *Million, et ux.* v. *Taylor*, 38 Ark. 428, the Court, at page 432, used the following language:

"There are many authorities exacting under such circumstances *uberrima fides* [utmost good faith]; with the duty of full disclosure of everything affecting value, and each other's interest in the subject matter."

We cannot agree with the able argument of appellant that the "Family Agreement" in this case should be sustained under the family settlement doctrine. It is true that such settlements are favored in law and this Court has many times upheld them. An exhaustive compilation of such cases may be found at page 855 in *Pfaff Adm.* v. *Clements*, 213 Ark. 852, 213 S. W. 2d 356. How-

ever, each case presents a different set of facts and circumstances and each must be so considered and decided.

Under the facts and circumstances in this case, we cannot say the trial court's decision was against the weight of the evidence and its decree is therefore affirmed.